# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES DAVIS,**<br>**Plaintiff** | : | |
| | : | **Criminal No. 15-138** |
| **v.** | | **[Case No. 2:22-cv-04158 (WB)]** |
| | : | |
| **UNITED STATES OF AMERICA,** | | |
| **Respondent** | : | |

# <u>O R D E R</u>

AND NOW, this      day of             , 2023, upon consideration of Petitioner James Davis's Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody pursuant to under 28 U.S.C. § 2255, and the government's response thereto, it is hereby ORDERED that the petitioner's motion is DENIED without an evidentiary hearing.  It is further **ORDERED** that the defendant, having failed to make a substantial showing of the denial of a constitutional right, there is no ground to issue a certificate of appealability.

BY THE COURT:

_____

HONORABLE WENDY BEETLESTONE
*Judge, United States District Court*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES DAVIS,                                       :
**Plaintiff**

                                            :   **Criminal No. 15-138**

**v.**                                       **[Case No. 2:22-cv-04158 (WB)]**

                                            :

**UNITED STATES OF AMERICA,**
**Respondent**                                       :

### GOVERNMENT'S RESPONSE TO DEFENDANT JAMES DAVIS'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

        The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, Sarah L. Grieb and Christopher Diviny, Assistant United States Attorneys for the District, and Corey R. Amundson, Chief of the Public Integrity Section, and Jennifer Clarke, Deputy Chief, hereby responds to petitioner James Davis's Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody pursuant to under 28 U.S.C. § 2255.  Petitioner claims his trial and appellate counsel were ineffective and alleges prosecutorial misconduct.  For the reasons stated below, the Petitioner's claim is without merit, and the government respectfully requests that this Court deny Petitioner's motion without an evidentiary hearing and deny the issuance of a certificate of appealability.

I.      **Factual and Procedural Background**

    A.  **Indictment, Offense Conduct, and Trial**

        On December 15, 2015, a grand jury in the United States District Court for the Eastern District of Pennsylvania returned a ten-count superseding indictment ("indictment") charging James Davis and John Green with one count of conspiracy to commit honest services

wire fraud and extortion under color of official right ("Hobbs Act extortion"), in violation of Title 18, United States Code, Section 371, and four counts of honest services wire fraud, in violation of Title 18, United States Code, Section 1343, and charging James Davis with two counts of filing a false tax return, in violation of Title 26, United States Code, Section 7206(1), and three counts of willful failure to file a tax return, in violation of Title 26, United States Code, Section 7203. The indictment alleged a complex bribery scheme involving the exchange of hundreds of thousands of dollars of concealed benefits for official action between Green, the former Sheriff of Philadelphia, and Davis, the largest vendor to the Philadelphia Sheriff's Office ("PSO"), over a nine-year period, from 2002 to 2011.  Dkt. No. 3

The case proceeded to trial on February 16, 2018.  On April 3, 2018, after a six-week trial, a federal jury convicted James Davis of one count of conspiracy to commit honest services wire fraud and extortion under color of official right, in violation of 18 U.S.C. § 371 (Count One); one count of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Count Five); two counts of filing a false federal tax return, in violation of 26 U.S.C. § 7206(1) (Counts Six and Seven); and three counts of willful failure to file a tax return, in violation of 26 U.S.C. § 7203 (Counts Eight, Nine, and Ten).  Dkt. No. 160.  On March 1, 2019, Davis was sentenced to 121 months' imprisonment, followed by one year of supervised release.  Dkt. No. 243.

### B.  Post-Conviction

Davis appealed his case to the Third Circuit, which affirmed the judgment and sentence of this Court on January 5, 2021.  Dkt. No. 292; *see United States v. Davis*, 841 Fed. App'x 375 (3d Cir. 2021).  Davis filed a petition for rehearing before the original panel or en banc, which was denied on February 9, 2021.  *See Davis v. United States*, 19-1604, Dkt. No. 108.  Davis

filed a petition for writ of certiorari to the United States Supreme Court, which was denied on October 18, 2021. *Id.*, Dkt No. 115.

On October 17, 2022, Davis filed this motion to vacate before the District Court alleging ineffective assistance of both trial and appellate counsel, and prosecutorial misconduct. Davis claims ineffective assistance of trial counsel on the following bases: (1) failure to provide a final witness list in accordance with court deadlines which allegedly led to deciding against seeking an expert witness until it was needed; (2) inability to determine proper expert witnesses because trial counsel neglected to thoroughly review discovery; (3) inability to respond to requests by the court for case law supporting the defense claim that the prosecution was vouching for the credibility of one of its witnesses; (4) failure of trial counsel to object to certain testimony of prosecution witnesses; (5) failure to request a separate evidentiary hearing to determine loss amount for sentencing, and failure to challenge the pre-sentence report on the use of acquitted conduct at sentencing; (6) failure to object to prejudicial hearsay comments made by a witness in a tape recording; (7) failure of both trial counsel to be present during the charging conference, despite objecting to certain jury instructions after they were read to the jury; and (8) failure to object to prosecutor's closing argument.  Davis claims ineffective assistance of appellate counsel based on the following allegations: (1) the decision to appeal based on a challenge to the sufficiency of the evidence was risky and unsound; and (2) failure to thoroughly review trial transcripts for other appealable issues, including the decision by the district court to exclude a report and testimony from a handwriting expert and the impact of trial errors.  Davis also alleges prosecutorial misconduct as a basis for his present motion.  In support, Davis claims that prosecutors (1) allowed and/or failed to correct false testimony of at least two witnesses and submitted a related forged document in evidence; and (2) improperly vouched for a witness by

presenting the terms of a witness' immunity agreement.   All of Davis's claims are meritless and his motion should be denied.

### C. Facts Adduced at Trial

At trial, the government presented approximately 35 witnesses and hundreds of exhibits, as well as many stipulations.  The testimonial and documentary evidence showed that from approximately 2002 through 2011, Davis, the owner of Reach Communications Specialists, Inc. ("Reach") and RCS Searchers, Inc. ("RCS"), gave John Green, Sheriff of Philadelphia, many gifts and things of value, in exchange for obtaining, maintaining, and increasing Sheriff's sale business with the Philadelphia Sheriff's Office ("PSO").

Janet Pina, Green's long time employee and self-described "best friend" of Green, testified that she worked at the PSO from 1988 to 2004, as Director of Communications, and eventually Chief of Staff and Contract Compliance Officer.  Trial Tr. 2/21/18 Pina at 10, 53.  Pina reported to Green, who liked to know what was going on.  *Id*. at 11.  Green was the decision-maker, and PSO employees would be reprimanded if they made a decision without Green's knowledge. *Id*.  The final decision as to what work a vendor would perform and what a vendor would be paid with regard to Sheriff's sales belonged to Green. *Id*. at 22.  Green negotiated the final terms, and a vendor would not have been able to do business with the PSO without Green's approval.  *Id*. at 23.  Later, when Pina left the PSO, started her own firm, and tried to contract for work with the PSO, she approached Green to negotiate. *Id*. at 55.

At the PSO, Green often had both breakfast and lunch meetings, where politics, PSO business, and other topics were discussed. *Id*. at p. 20-22.  Davis and his late business partner, James Cassell, paid for ninety percent of the breakfast meetings. *Id*. at 18.  Lunch meetings were often held at The Capital Grille, and again, Davis paid the bill. *Id*. at 20.

When John Green planned to get married, he told Pina and Davis at a breakfast meeting that he had found a house that he wanted. *Id*. at 67. The group went to look physically at the house after this meeting. *Id*. Pina understood that Green wanted the home to be "move-in ready" and for it to be a surprise for his new wife. *Id*. at 69. Davis, his late business partner, Cassell, and Green agreed that Davis and Cassell would purchase and renovate the property and then sell it to Green. *Id*. The house was at Mt. Pleasant and Mansfield. *Id*. at 70. Davis and Cassell proceeded to purchase the home and make and pay for the renovations. *Id*. at 69-72. Pina assisted with picking out furniture, paint color and staging. *Id*. at 72-75. Green moved into the home shortly after getting married, in the month of February. *Id*. at 75. Eventually, Green purchased the home from Davis. *Id*.

Davis had business with the PSO, which grew over time. *Id*. at 14. With respect to contracts, Green was aware of the requirement to take contracts for professional services to the City Law Department for review. *Id*. at 28. However, Green only decided to put contracts in writing after receiving public criticism, which Pina recalled being from a City Controller's audit report. *Id.* at 30. In January 2003, Green issued a written memorandum establishing a new policy to obtain written agreements or contracts with all current and future vendors. *Id*. at 34-35. On February 25, 2003, the PSO and Reach, Davis's company, entered into a written contract for Reach to do all Sheriff's sale advertising. *Id*. at 42. Furthermore, Green placed Davis's sister and brother-in-law as heads of the Real Estate Division at the PSO. *Id*. at 50-52.

Pina assisted Green in preparing the campaign finance reports ("CFRs") for his re-election campaigns when Pina was Chief of Staff at the PSO. *Id.* at 77-78. Pina needed to report the income and the expenses for the campaign on the reports. *Id.* at 78. Green saw and signed each of the CFRs. *Id.* at 78-79. When Pina stopped preparing the CFRs, Barbara Deeley assumed that

responsibility. *Id.* at 79. Green was involved in his campaigns, knew about the campaign's finances, and chose Reach to do the advertising for the campaign. *Id*. at 79-81. Over time, the campaign built an unpaid debt to Davis of over $100,000. *Id*. at 84. Nevertheless, Green allowed the campaign to continue to have Davis do the advertising work, and Davis never stopped doing the work despite the outstanding debt. *Id*. Furthermore, Davis did not invoice the campaign for his work, since he had contracts with the PSO, and it was to his advantage to ensure that Green was re-elected. *Id*. at 87-88. After all, according to Pina, "as long as [Green] was in business, we were in business." *Id*.

Green initially did not want to run for re-election in 2007. *Id.* at 88. Green met with Davis, Pina, Barbara Deeley (Green's Chief of Staff at the PSO), Cathy Hicks (Green's Executive Assistant at the PSO), Patricia West (a former PSO employee and Pina's business partner at the Tyler Firm), Jerry Mondesire, (a publisher for a newspaper in which the PSO placed advertisements for Sheriff's sales) and Harold James (a close confidante of Green) at a hotel on City Line Avenue, and advised that he did not want to run for Sheriff. *Id.* at 53, 89-91. Davis and others at the meeting encouraged Green to run at least for one more term. *Id.* at 91. It was apparent to Pina that Davis was encouraging Green to run because he wanted to maintain his contracts. *Id.* at 91-92.

Barbara Deeley testified that she worked at the PSO from approximately 1989 through February 2012. Trial Tr. 2/22/18 Deeley at 4. Deeley was promoted to Chief of Staff in 1995, Chief Deputy in 2010, and Acting Sheriff in 2011. *Id*. at 8, 17-18. At the PSO, Green had the authority to make decisions about vendors, including what business and work the vendors did, what fees they were paid, and if there should be an increase in either work or fees. *Id*. at 27. PSO employees could not make decisions without Green's approval. *Id*. at 28. Deeley would have

lunch with Green and Davis a couple of times a week, and either she or Davis would pay. Trial Tr. 2/23/18 Deeley at 6.

There was a small group of people, including Deeley and Davis, who would advise Green and engage in discussions with Green.  *Id*. at 10. Davis gave his opinion and advice. *Id*. When the time came for Green to decide whether to run again in 2007, the group was in favor of it. Specifically, Davis was in favor as he was worried about his company if a new sheriff were elected. *Id*.  According to Deeley, Davis had a lot of business and interest at the PSO. *Id*. at 11. Eventually Green agreed to run for re-election in 2007. *Id*.  Green sat down with Davis and Deeley, and said that he would run, but that he was not going to do all of the work.  *Id*.  Rather he directed Davis and Deeley to do all of the work, which meant raising the money, going to functions and meetings, and running the campaign. *Id*. at 11-12.

When Deeley told Davis that she was not able to do it alone, Davis told her "don't worry about it, I got you." *Id*. at 12-13.  Davis worked on almost everything with Deeley, including raising money. *Id*.  Once Green realized that he would have an opponent in the 2007 Democratic primary, Michael Untermeyer, the campaign intensified. *Id*. at 15-16.  Davis, Green, and Deeley had conversations together about the campaign, including discussions about campaign strategies involving Green's opponent and advertising. *Id*. at 73.  Davis and Deeley had to raise money and advertise, and Green started going to events and board meetings. *Id*. at 15-16.  Davis paid for the campaign advertising. *Id*.

Deeley became the campaign manager and took over financial responsibilities of the campaign when Pina left the PSO. *Id*. at 35.  Only Deeley had access to the campaign checkbooks and ATM card. *Id*.  Eventually, because Deeley worked at the PSO, Deeley had to step down publicly from the position of campaign treasurer. *Id*. at 40-42.  Deeley asked her cousin

and subsequently a friend to stand in as treasurer in name only while Deeley continued to operate the campaign's finances. *Id*.

Deeley was also responsible for filing CFRs for the campaign. *Id*. at 37.  Deeley completed the CFRs herself and Davis had someone from his office file them electronically. *Id*. at 38.  Deeley signed Green's name to the CFRs, but Green knew that she was signing them. *Id*. at 44.

Green was involved in campaign finance decisions, and Deeley kept Green apprised of the campaign finances during the 2007 campaign. *Id*. at 44, 49.  When the campaign needed money, Deeley went to Green, who told Deeley to go to Davis. *Id*. at 50–52.  In May 2007, Deeley indeed went to Davis, who told her not to worry and that he would take care of it. *Id*. Shortly thereafter, $50,000 came into the campaign, and when she asked Davis about the money, he instructed her not to put it on the CFR. *Id*. at 53.  According to Deeley, Davis always came through with money for the campaign. *Id*. at 45.

In September 2007, the campaign needed approximately $12,600 for a benefit and a related advertisement. *Id*. at 57-58.  Deeley went to Green to tell him and to ask him what to do, and Green instructed her to talk to Davis. *Id*.  According to Deeley, Davis agreed to give her the money to pay for this benefit, but did not want to put it directly into the campaign because he was doing business with the PSO, and did not want it to look like he was giving that much money. *Id*. at 66.  Furthermore, the donation was over the campaign limit for an individual donation to a candidate.  *Id*.  Therefore, Deeley and Davis devised a plan by which Davis would give the money to Deeley, and she would put it in the campaign. *Id*.  Davis and Deeley executed this plan, and Davis further instructed Deeley not to record it in the CFRs. *Id*. at 67.  Deeley told Green that she was able to get the tickets for the benefit and the advertisement. *Id*. at 71.  The campaign,

Philadelphians for Green, never reimbursed Davis for the money he contributed to the campaign, or for the campaign advertisements done by Davis's company. *Id*. at 72.

At a certain point, Deeley received invoices from Davis for the campaign advertising expenses, but she did not pay them. *Id*. at 75-76.  Deeley told Davis that the campaign did not have the money to pay these invoices. *Id.* Davis told her to hold on to the invoices and not to worry about paying. *Id*.  Davis also instructed Deeley to record false expenditures and unpaid debts on the CFRs, which she did. *Id*. at 84.  For example, at Davis's direction, Deeley recorded an expenditure of a $10,000 payment to Reach dated February 1, 2007, as well as two payments of $1,252 in February and March of 2007.  *Id*. at 86.  These expenditures were never made by the campaign. *Id*.

Davis also directed Deeley to record a $30,000 unpaid debt on the CFR, which purported to be for television and radio ad production. *Id*. at 90-93.  Davis instructed Deeley to record that $30,000 debt on all CFRs for the remainder of the time that CFR filing was required. *Id*.  At Davis's direction, Deeley recorded the false debt on every CFR through 2010. *Id*. at 95 - 96.

Darnell Lloyd, the husband of Davis's niece and an employee of Davis at Reach from 2000 to 2012, testified that shortly after April 25, 2007, Davis presented a real estate investment loan opportunity to Lloyd in which Lloyd would loan $50,000, and Lloyd would be repaid with interest.  Trial Tr. 2/27/18 Lloyd at 3-5, 40-41.  Lloyd agreed, and on May 11, 2007, Lloyd wrote a check for $50,153.50 to RCS.  *Id.* at 41-42. When Lloyd went to RCS to sign the mortgage paperwork, he found out that the loan was to Green. *Id.* at 42-43.  Lloyd was surprised and questioned Davis.  Davis explained that Green had a property on 68th Avenue for a while, and Green wanted to fix up the property.  *Id.* at 43-44. Lloyd was never told that RCS, in fact, wired

the $50,000 to Green's campaign. *Id.* at 44.  Green, further, did not repay the loan as agreed in the loan documents. *Id.* at 49.  Michelle Augustus, RCS Vice President of Operations and notary public, testified that Green and Davis together approached her in her office and asked her to notarize Green's signature on the documents, which she did after he signed in her presence.   Trial Tr. 2/28/2018 Augustus at 86, 123-126

El'lan Morgan, Davis's daughter, testified that Davis asked her to donate $2,500 to Green's campaign, and that Davis repaid her in full. 2/21/18 Morgan at 6.

Tyrone Bynum, the Director of Finance for the PSO, was responsible for maintaining the contracts at the PSO.  However, to get a contract created with Reach/RCS, Green would work out the details of the contract with Davis, and then told Bynum to meet with Davis. Trial Tr. 3/1/18 Bynum at 10.  All terms were decided upon by Davis and Green, and Bynum had no authority to change any terms of the contract. *Id*. at 10-12.   In fact, when Bynum and Davis met to actually execute the contract, Davis would come to the meeting with the contract already prepared. *Id*. at 10.

Davis's sister, Crystal Stewart, was in charge of the Real Estate Department at the PSO, and sometimes even received, on behalf of Reach/RCS, the checks that the PSO paid to Reach/RCS, despite the fact that she was a PSO employee.  *Id*. at 25.  Bynum eventually complained about Stewart, but was demoted by Green. *Id*. at 65-66.  Bynum described Davis as being present at the PSO several times a week. *Id*. at 66.  Bynum also testified that PSO employees had to get authorization from Green to make decisions, even when Green was not in the office. *Id*. at 69.

Andrew Miller, a competitor of RCS who owned his own title agency, was able to get a small amount of Sheriff's sale work. Trial Tr. 3/1/18 Miller at 4-5.  Specifically, Miller did

distribution policies and distribution of funds for tax sales only.  *Id*.  Miller knew that work for the mortgage foreclosure sales, as opposed to the tax sales, was more lucrative, and he would have liked to have that work. *Id*. at 17.   To obtain the work that he did have, Miller had to meet with both Sheriff Green and Davis.  *Id*. at 20-22.  Miller also met with Davis after the initial meeting with Green and Davis, and later thanked Davis via email for his help in getting him a piece of the business. *Id*. at 24.

Similarly, Jacqueline Roberts, also the owner of a successful title agency, received a small amount of tax sale work from the PSO. Trial Tr. 3/1/18 Roberts at 188-189.  Specifically, Roberts did distributions of funds from tax sales to city agencies.  *Id*. at 191. To get that business, Roberts also met with both Sheriff Green and Davis. *Id*. at 190.  Roberts also knew that the mortgage foreclosure work was more profitable than the tax sale work. *Id*. at 189.

Matthew Carrafiello, a former Undersheriff at the PSO and an attorney, testified that Green should have put contracts in writing, but never asked him for advice on whether he should.  Trial Tr. 3/16/18 Carrafiello at 14.  Furthermore, any contracts entered into by the PSO should be prepared by a lawyer, or at least reviewed by a lawyer. *Id*.  The City of Philadelphia has a law department, whose staff is responsible for reviewing contracts entered into by city officers. *Id*. at 15.  Green never asked him for advice with respect to contracts with Reach/RCS. *Id*. at 19.

Dan Cantu-Hertzler, an attorney at the City of Philadelphia Law Department, who had been in charge of the section at the Law Department that was responsible for contracts, testified that all city contracts must be in writing. Trial Tr. 3/22/18 Cantu-Hertzler, at 7, 31. Further, the Law Department must prepare and approve all contracts in which the City is concerned, and the contracts between the PSO and Reach are contracts in which the City was concerned.  *Id.* at 36.

Louis Pichini, Managing Director at Deloitte Financial Advisory Services, testified that, in 2011, Deloitte conducted a forensic investigation of the PSO at the request of the City Controller's Office.   Trial Tr. 2/22/18 Pichini at 5, 7.   During the investigation, Pichini tried to find the underlying contracts between the PSO and Reach/RCS.  *Id.* at 9, 12-13.  Pichini understood that the contracts were to be publicly available and that the contracts were to be done at the Law Department.  *Id.* at 13.   Pichini did not find the contracts to be publicly available, and he did not find the contracts available at the Law Department.  *Id.* at 13, 20-21.

Nathan Gorenstein, a former news reporter for the Philadelphia Inquirer, testified that, in 2003, he was covering City Hall in Philadelphia. Trial Tr. 3/16/18 Gorenstein at 39.   During the course of his job, Gorenstein researched and wrote articles about the PSO. *Id*. at. 48.   Gorenstein requested documents from the PSO, and often, the PSO did not comply with his request.  *Id*. at 51.   Gorenstein eventually received contracts between Reach and the PSO, but according to Gorenstein, "they didn't exist until I asked for them." *Id*. at 52.

Harold James was a former state representative and another self-described best friend and advisor to Green. Trial Tr. 3/1/18 James at 226.   After he retired, James wanted a consulting contract with the PSO, and therefore, he talked directly to Green to obtain the work. *Id*. at 220.   In 2007, James described meetings with Davis and Green where the group discussed whether Green would run that year. *Id*. at 228. James recalls that Davis was in favor of Green running again. *Id*.  Later, in 2010, Green was considering retirement, and James and others flew to Florida to discuss the future of the PSO with Davis and Green. *Id*. at 236-237.   Davis paid for the trip for James and Jewell Williams, the next candidate for Sheriff in Philadelphia. *Id*.   James believed that Davis was facilitating this meeting because, in James' opinion, Davis wanted to continue his business with the PSO. *Id*.

Catherine Hicks, Green's executive assistant, was also supposed to attend the meeting in Florida to discuss the future of the PSO with Green, Davis, Williams, and James. Trial Tr. 3/5/18 Hicks at 167.  Hicks did not end up attending the meeting, but Davis paid for her flight to Florida. *Id*. at 168, 171. Hicks recalls that while Green was Sheriff, Davis would attend meetings at the PSO a few times per week. *Id*. at 135. Hicks recalls that the PSO had a policy of not accepting gifts from vendors, but Hicks was unsure as to whether Green followed his own policy. *Id*. at 179-180.

Nyanquoi Jones, an analyst, summarized the payments made by Davis to Green throughout the conspiracy.  Between 2002 and 2005, Davis purchased and paid for renovations for 1001 Mt. Pleasant Avenue, and in 2003, Davis sold the property to Green at a loss of over $39,000 and below the appraised value. Trial Tr. 2/22/18 Jones at 163-67; Govt. Exh. Summary 2. According to records, Green reported living at 1001 Mt. Pleasant Avenue starting in February 2003, and reported purchasing the property in May 2003. In addition, according to records, Green did not pay any rent during this time period, and Davis's companies continued to pay utilities. *Id.* at 197-202.  In 2004, Davis hired Green's wife as a subcontractor and started paying her within five days of Green's wife starting her business, and from 2004 through 2010, Davis paid Green's wife over $89,000. 3/6/18 Jones at 63-66; Govt. Exh. Summary 3. In 2007 and 2008, Davis's companies paid over $148,000 in campaign advertising expenses for Green's 2007 re-election campaign, and Green's campaign never reimbursed Davis's companies for these expenses. 2/28/18 Jones at 38-39, 55-56; Govt. Exh. Summary 5. Also, in 2007, Davis caused indirect campaign contributions to be made to Green's campaign: On April 30, 2007, $2,500 from El'lan Morgan; on May 11, 2007, $50,000 from Lloyd's business; and on September 10, 2007, $12,600 from Deeley. *Id.* at 57-58; Govt. Exh. Summary 7. In addition, on October 1, 2008, via check, Davis

gave Green $4,000. 3/5/18 Jones at 19; Govt. Exh. Summary 8.  On April 2, 2010, at a time when

Green was purchasing his retirement home in Florida, Davis gave Green, via check, $12,000.  *Id*.

at 27; Govt. Exh. Summary 8.  On May 18, 2010, around the time that Green owed another

payment toward the purchase of his retirement home in Florida, Davis gave Green, via check,

$50,000. *Id*. at 48; Govt. Exh. Summary 8.  On December 20, 2010, the same day that Green closed

on his Florida retirement home, Davis wired $258,151.32 to Green's title company. *Id*. at 60; Govt.

Exh. Summary 8.  Finally, on September 28, 2011, via check, Davis gave Green another $10,000.

*Id.* at 64; Govt. Exh. Summary 8.

   Many of the benefits that Davis gave to Green were funds from Reach and RCS

that Davis moved through different accounts before paying the money to Green.  *Id.* at 15-71.

Further, while Davis indicated that the payments to Green were loans on many of the checks that

Davis gave to Green, Davis did not report these payments as loans to Green in Reach/RCS's

Quickbooks, which were the financial accounting records for Reach and RCS.  *Id.* at 71.

Moreover, other than $258,151.32 which Green paid back to Davis in March 2011 with no interest,

$100 which Green gave to Davis in May 2011, and $2,000 which Green paid to Davis in 2015,

Green did not repay Davis for any of the other payments.  *Id.* at 80-90.  Moreover, these payments

by Green were not consistent with repayments on commercially available loans.  *Id.* at 90-91.

   Alan Cohen, Davis's accountant, testified that he prepared Davis's personal and

business tax returns from 2002 through 2007.  Trial Tr. Cohen 3/26/18 at 201-203.  Cohen received

the Quickbooks for Davis's companies to prepare the business tax returns.  *Id.* at 217-218.  Cohen

was not told that Davis's companies paid for Green's campaign advertising in 2007 and reported

the payments as business expenses of Reach in the Quickbooks.  *Id.* at 263-264.  While Cohen

gathered information and records relating to loans that Davis's companies gave in the preparation

of the tax returns, Cohen was not told of any loans that Davis's companies gave to Green. Trial Tr. Cohen 3/8/18 at 28-33. Further, while Cohen was provided some records relating to the Mt. Pleasant property, Cohen was never told that the property related to Green. *Id.* at 33-36.

John Hess, a Special Agent with the Federal Bureau of Investigation, summarized the fees and profits made by Davis as a result of his bargain with Sheriff Green. According to the advertising contract, Reach was to be paid a 15% commission. In addition to this commission, however, Davis received fees from the Sheriff's sale work for charges not included in the written contracts. Trial Tr. 3/9/18 Hess at 11. Those additional fees totaled over $7.3 million from approximately 2004 through 2010. *Id.*

Michael Cooke and Hope Smart testified about Green's personal financial reporting obligations. Both witnesses confirmed that Green, in violation of his obligations, never publicly disclosed any of the gifts, money, or benefits that he received from Davis. Specifically, Cooke, the Director of Enforcement for the City of Philadelphia Board of Ethics, testified that City of Philadelphia officials are required to file statements of financial interest. Trial Tr. 3/6/18 Cooke at 9. The statements of financial interest are required so that the public can see what particular financial interests a public official has, and so that the public can make an evaluation about whether they believe those candidates are acting in the public interest, or if they are otherwise influenced. *Id.* These disclosures are required at both the city and state level. *Id.* Subject to amount limits, any transaction of money between Green and a non-family member would have triggered a reporting requirement. *Id.* at 33.

From 2002 through 2010, Green was required to disclose gifts, sources of income, and loans on the City of Philadelphia Statement of Financial Interest forms. *Id.* at 17-26. Cooke

confirmed that Green filed them from 2002 through 2009, but never disclosed anything at all. *Id*. Furthermore, Green did not file the form for calendar year 2010, as required. *Id*. at 26.

Hope Smart, a PSO Human Resources supervisor, testified similarly.  Green was required to file statements of financial interests with the city and state, and he did so between 2002 and 2009, but never noted any gifts, loans, or other sources of income. Trial TR. 3/5/18 Smart at 8-30.  Smart communicated directly with Green about these forms, and Green never told her to add or change anything. *Id*.

Cooke also testified that public officials were required to file a letter or make a reporting of any conflict of interest, that is, the official has an ongoing financial relationship that he or she can affect through their official action. 3/6/18 Cooke at 31. Green never filed any such letter. *Id*.

Last, Cooke testified that campaign finance reports are required in the City of Philadelphia, and serve the purpose of promoting transparency regarding the candidates. *Id*. at 37. Campaign finance laws limit individual contributions to $2,500 per person to an individual candidate, and corporations are not allowed to make such contributions. *Id*. at 41-42.

## II. <u>Claims of Ineffective Assistance of Counsel</u>

### A. <u>Legal Standard</u>

Courts apply a "highly deferential" standard in assessing claims of ineffective assistance of counsel.  *See United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).  To prevail, the petitioner must satisfy the two-prong *Strickland* standard and prove that (1) counsel's performance "fell below an objective standard of reasonableness" and (2) the defendant suffered prejudice such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id*. (quoting *Strickland*, 466 U.S. at 688, 694).  To meet the first

prong, the defendant must overcome the "strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689).

As *Strickland* cautions,

> "A fair assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the evaluation, a
> court must indulge a strong presumption that counsel's conduct
> falls within the wide range of reasonable professional assistance;
> that is, the defendant must overcome the presumption that, under
> the circumstances, the challenged action "might be considered
> sound trial strategy."

466 U.S. at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *see also Premo v. Moore*,

562 U.S. 115, 122 (2011) ("The question is whether an attorney's representation amounted to

incompetence under 'prevailing professional norms,' not whether it deviated from best practices

or most common custom." (quoting *Strickland*, 466 U.S. at 690)).

In assessing counsel's performance courts look to whether counsel's assistance was

reasonable in light of all the circumstances at the time of counsel's conduct.  *See, e.g.*, *Strickland*,

466 U.S. at 688.  The Supreme Court has explained that "the proper measure of attorney

performance remains simply reasonableness under prevailing professional norms" and that to

succeed on this first prong, the defendant must establish "that counsel made errors so serious that

counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

*Id*. at 687-88.  "An attorney is presumed to possess skill and knowledge in sufficient degree to

preserve the reliability of the adversarial process and afford his client the benefit of a fair trial."

*Diggs v. Owens*, 833 F.2d 439, 444-445 (3d Cir. 1987).

To succeed on a *Strickland* claim, in addition to establishing a deficiency in counsel's performance, a defendant also must demonstrate actual prejudice. *See, e.g.*, *Strickland*, 466 U.S. at 691-92. The prejudice prong requires that the defendant "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The Supreme Court has explained that a "reasonable probability is a sufficient to undermine confidence in the outcome." *Id*.

The Third Circuit has "endorsed the practical suggestion in *Strickland* [that we may] consider the prejudice prong before examining the performance of counsel prong 'because this course of action is less burdensome to defense counsel.'" *United States v. Booth,* 432 F.3d 543, 546 (3d Cir. 2005) (quoting *United States v. McCoy,* 410 F.3d 124, 132 n. 6 (3d Cir. 2005)); *see also Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). Indeed, if a claimant cannot satisfy the deficient performance prong or the prejudice prong, the ineffective assistance claim fails, and the court need not address the remaining prong. Because the Petitioner fails to satisfy his burden on each *Strickland* prong, his motion should be denied.

**B. <u>Argument</u>**

1. <u>Petitioner Suffered No Prejudice as a Result of Counsel's Performance</u>

None of the Petitioner's claims show that either trial counsel or appellate counsel were constitutionally deficient. As an initial matter, however, Petitioner's claim fails on the second Strickland prong of prejudice. He has presented no facts showing actual prejudice, specifically a reasonable probability "that but for counsel's unprofessional errors, the result of the proceeding would have been different."

The evidence at trial, and therefore on the appellate record, was overwhelming and established a long-standing corrupt relationship between Davis and Green which consisted of bribes of both political contributions and non-campaign contributions, all given by Davis to Green with the *quid pro quo* agreement that Davis would receive, maintain, control, and increase his business with the Sheriff's sales.

During the course of the trial, the government introduced evidence showing the payment by Davis to Green of several gifts: a discounted home on Mount Pleasant Avenue in Philadelphia, free rent and utilities at that home, over $148,000 in campaign advertising, $89,364.70 to Green's wife, hidden and indirect payments of $65,100 to Green's campaign, a $258,151.32 interest-free loan, and additional payments by Davis to Green of $76,000.

When Green wanted a move-in ready home, Davis bought it, refurbished it, and sold it to Green at a discount.  When Green needed money to purchase his retirement home in Florida, Davis again provided Green with tens of thousands of dollars and an interest-free loan. Davis hired Green's wife as a subcontractor and paid her over $89,000 over the course of several years.  In return, Davis's companies were able to control and increase the business of Sheriff's sales.

When it was time to run for re-election, Green already knew that Davis wanted the PSO business and sought to continue and increase it, and because he was the Sheriff, it was his decision as to who got the business.  Davis was, of course, in favor of Green running again and encouraging Green to do so, in order for Davis to keep his business.  Because when Green was in business, so was Davis.  Therefore, when Green decided to run again, he directed Davis to run things, along with Barbara Deeley. When the campaign needed money, Deeley turned to Davis, and Davis came through.  Davis paid for over $148,000 in campaign advertisements for the 2007

campaign alone, knowing quite well that he would not get repaid, and knowing that any invoices he submitted were merely a cover.  Davis arranged for a $50,000 deposit into the campaign via a loan scheme he concocted between his nephew-in-law Darnell Lloyd and Green.   Davis contributed $12,600 to Green's campaign through Deeley, and $2,500 to Green's campaign through his daughter.

When Green wanted a retirement home in Florida, Davis gave him checks in the amount of $10,000 and $50,000, and on the closing date, Davis wired $258,151.32 to Green's title company.

In return, the specific requested exercise of official power by Green was allowing Davis to maintain and increase his business with the PSO.  In addition to maintaining the advertising business for the lucrative mortgage foreclosure sales, Davis's companies received additional and increasing work and fees from Green, which were uncontracted-for.  Reach and RCS billed the PSO for all these additional fees, and the PSO, under Green's supervision, paid it.  As a result, Reach and RCS received millions of dollars in extra hidden fees.

In addition to proof of the gifts from Davis to Green, and evidence of the official acts by Green benefiting Davis, the government presented extensive evidence of the parties' intent.  For example, the many instances of efforts by Davis and Green to conceal different parts of their arrangement show consciousness of guilt.

First, the circumstances surrounding the written contracts between the PSO and Reach and RCS were significant.  Green and Davis had an oral agreement for the Sheriff's sale work, which is not permitted by the City of Philadelphia Law Department and bad business practice in any case.   Green continued to resist written contracts reviewed by the Law Department, even after criticism from the City Controller. When Green finally did agree to create written

contracts, it was only after massive media criticism.  Even then, Green never took the contracts to the City Law Department for legal review and approval, which he should have done.  Last, the contracts that were created and signed by the PSO and Davis did not include all the work that Davis was doing, or all the fees that Davis was receiving.  From this evidence, a jury could infer that Green and Davis were purposefully trying to keep their dishonest agreement hidden.

Green was also obligated to file statements of financial interest with the city and state.  Generally, and for a number of reasons, Green was required to report all the various gifts or loans he received from Davis.  However, year after year, Green filed his reports without including any mention of Davis or the money, gifts, discounts, campaign contributions or other assistance Davis gave to Green.

At the same time, Davis hid his campaign contributions and efforts to funnel money into Green's campaign.  He told Barbara Deeley to record false invoices to Reach on the CFRs.  He instructed Deeley to report a false $30,000 debt to Reach and carry it forward in perpetuity, to make it seem as if Reach intended to be re-paid, to hide the fact that this was merely a gift to the campaign, and to mask the fact that this donation exceeded the limit.  He arranged for proceeds from the $50,000 "loan" from Lloyd to Green to be routed to the campaign and instructed Deeley not to report it.

Not only was trial counsel not ineffective in failing to pursue handwriting expert earlier, nor for failing to make certain objections now proposed by Davis, but such actions would not have impacted the jury verdict because the evidence of Petitioner's guilt was overwhelming.  The jury heard evidence of multiple bribes paid by Davis to Green over the course of several years, and of their attempts to cover up and distance themselves from those bribes.  The defendant also took the stand in this case, so the jury had the opportunity to hear from and evaluate the defendant

himself and evidently, the jury did not find him credible.  Nor would the outcome at sentencing have been different had his counsel asked for a separate evidentiary hearing to determine the Sentencing Guidelines range.  While the Petitioner was certainly entitled to maintain his innocence at sentencing, he rejected the opportunity to show any remorse or humility and instead insisted that his corrupt behavior was for the good of the community.  The Petitioner has simply not articulated any basis to conclude that there is a reasonable probability that the outcome of trial or sentencing would have been different.  Because the outcome of this entire proceeding would have remained the same in spite of the Petitioner's claims of counsel incompetence, he has suffered no prejudice and his petition should be denied.

    2.   Petitioner has not Demonstrated that Counsel's Performance was Constitutionally Deficient

        i.   Trial counsel was not ineffective for failing to secure a handwriting expert in advance of trial

Davis's first and second claims relate to trial counsel's attempts at trial to introduce handwriting expert testimony.  According to Davis, his counsel was ineffective in their efforts for two reasons.  Davis first alleges that trial counsel advised him that "there is no strict requirement to supply an absolute final list of witnesses in complying with court ordered deadlines and that any witness list submitted could be modified … because the court would not block evidence or testimony of a witness in a criminal preceding [sic] that was critical to the administration of justice and a fair trial." Dkt. 304 at 5.  According to Davis, this approach caused his trial counsel to decide "not to commit to the expense of expert witnesses until and if it was determined such testimony was needed during trial."  Davis simultaneously alleges that his attorneys failed to thoroughly review the discovery, and had they reviewed the discovery, they would have discovered the alleged forgery, sought the services of a handwriting expert, and given the adequate expert notice.  For

several reasons, these allegations fail to demonstrate that his trial counsel's performance fell below an "objective standard of reasonableness."

To provide context, and as stated above, Davis and Green entered into a years-long scheme whereby Davis provided Green with things of value in exchange for sheriff's sales contracts. The things of value included Davis orchestrating a $50,000 loan from his nephew-in-law, Darnell Lloyd, to John Green. At Davis's encouragement, Lloyd agreed to make what he believed was a $50,000 investment in the form of a loan, which he expected to be repaid with interest. When Lloyd arrived at Davis's office to sign the loan documents, he realized for the first time that the investment opportunity was in fact a mortgage loan to John Green. RCS employee and notary public Michelle Augustus presented Lloyd with documents to sign. Separately, Green signed the same documents in the presence of Augustus, who notarized the documents.

On or about March 14, 2018, during trial, counsel for Davis and Green notified the government that they intended to present handwriting expert opinion testimony, specifically to challenge the veracity of the signatures of Green that appeared on the $50,000 promissory note and mortgage. Their purported expert, who reviewed only photocopies of signatures and not actual handwriting samples, opined that the signatures did not in fact belong to Green but rather to Barbara Deeley. The government orally moved for the exclusion of the handwriting expert, and defense counsel for Davis and Green filed a joint trial brief in opposition to the government's motion to exclude. After argument, this Court denied the defendants' request to call the handwriting expert, citing the following as the bases for the decision:

- That Barbara Deeley testified for two days, was cross-examined extensively, and that defendants "explored her habit of signing John Green's name, but did not question her about the mortgage document." Trial Tr. 3/19/2018 at 58.

23

- That Michelle Augustus testified that she notarized Green's signature on the documents, and was subjected to cross-examination. *Id*.

- That Darnell Lloyd testified that he communicated about the mortgage note in 2015 and that Green agreed to pay back the note. *Id*.

- That the defense failed to comply with the notice requirements of Federal Rule of Criminal Procedure 16. *Id*.

First, the government does not agree or concede that these documents were forged or signed by anyone other than John Green, as presented at trial by the notary witness, Michelle Augustus, who testified that Green signed the documents in her presence. For her part, Barbara Deeley testified that although she signed Green's name on campaign finance reports, she was unaware of the $50,000 loan until 2015, when she was asked about it and she in turn asked Green about it. Trial Tr. 2/2/2018 at 55-57. She further testified that Green told her he had to pay someone named Darnell because of it. *Id*. Defense counsel recalled Deeley to the stand in their case, after the denial of their request to call a handwriting expert. Trial Tr. 3/26/2018 at 28-44. Counsel asked her directly about the mortgage documents and she denied forging Green's signature on the documents. Id. at 32-33, 36-37, 43-44. Darnell Lloyd testified that when he raised the issue of the loan with Green later, Green never denied signing the loan.

Second, there is ample evidence demonstrating that as a general matter, defense counsel did an extremely thorough review of discovery in this case. Defense counsel filed several lengthy pre-trial motions identifying multiple complex legal issues. They conducted thorough cross-examination of each of the government's many witnesses. And they presented a comprehensive defense case to the jury, including the testimony of over 20 witnesses. None of this would have been possible had trial counsel not thoroughly reviewed discovery. Just because

this new legal theory only occurred to counsel during trial bears less on counsel's performance and more on the wisdom or rationale of the theory itself.

      ii.  <u>Trial counsel was not ineffective for failing to cite nonexistent case law</u>

      Davis next alleges that trial counsel was ineffective for their inability to provide on-the-spot case law as to whether the government should be ordered to vouch for their own evidence.  After this Court made its ruling denying defendant's motion for admission of expert testimony, defense counsel immediately asked the Court to inquire with the government whether it vouched for the integrity of the mortgage and the $50,000 note described above.  Trial Tr. 3/18/2018 at 65.  In response, this Court asked defense counsel for case law to support his position, more specifically, case law suggesting that the prosecution has a "duty to vouch for a particular item that is introduced into evidence." *Id*.  Defense counsel, unsurprisingly, was unable to provide any legal justification beyond argument for their request.  This is because the no legal precedent exists to make such a request.  "Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through the personal knowledge or[,]" in most cases, "by other information outside of the testimony before the jury." *United States v. Walker*, 155 F.3d 180, 184 (3d Cir. 1998); *see also United States v Lawn*, 355 U.S. 339, 359 (1958).  In the jury trial context, vouching by the prosecution is improper and concerning because  "(1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id*., *see also United States v. Young*, 470 U.S. 1, 18 (1985).   Although the defendant's request here was outside of the jury context, the same

concerns exist.  For the prosecuting attorneys to personally assure the Court of the credibility of its evidence or witnesses would be irrelevant and improper.  And there is simply no precedent for a court to ask or order a prosecutor to affirmatively vouch for its evidence.  Because trial counsel's request was without legal justification, they were not ineffective for failing to defend such a request.

      iii.   <u>Trial counsel was not ineffective for failing to make frivolous objections</u>

Davis next contends that trial counsel was deficient for failing to make certain objections during trial.  Per the Petition, those objections include: failing to object when witnesses such as Harold James and Janet Pina opined as to Davis and Green's motivations; failing to object to "prejudicial hearsay comments made by Deeley in a government orchestrated tape recoding [sic] of a conversation with former Sheriff John Green;" and failing to object to allegedly inflammatory statements made by the prosecutor during closing argument.  Dkt. 304 at 14. Because such objections would have been baseless, frivolous, and inevitably unsuccessful, trial counsel's failure to make such objections was not ineffective lawyering.

First, Davis claims that counsel should have objected to witnesses testifying about their understanding of the motivations of Davis and Green.  As lay witnesses, James and Pina were permitted to testify to opinions that were "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702."  Fed. R. Evid. 701.  If these factors are satisfied, a lay witness may testify to their understanding of conduct and statements which they perceived.  *See United States v. Anderskow*, 88 F.3d 245 (3d Cir. 1996) (holding that defendant was not entitled to new trial based on co-conspirator's testimony regarding his belief that defendant knew of the

26

fraudulent scheme); *see also United States v. DePeri*, 778 F.2d 963 (3d. Cir 1985) (finding that it was permissible for a lay witness to testify as to his understanding of defendant's ambiguous statements).

Pina was a long-time employee at the PSO and had been friends with John Green for decades. Harold James was a former elected official in Philadelphia and another close friend of Green. Both witnesses spent time with Green and Davis during the relevant time period, and testified that Davis wanted Green to run for office again. Their testimony was based on conversations they had with Davis and Green, in other words, conduct and statements of Davis and Green that they perceived firsthand. Because their testimony on this topic was rationally based on their perceptions, was helpful to determining the facts in issue, and was not based on scientific expertise, trial counsel had no basis for objection.

Next, Davis claims that his counsel should have objected to what he describes as "prejudicial hearsay statements" in a recording of a conversation between Deeley and Green. Dkt. No. 304 at 14. At the outset, it should be noted that the government did not present this recording in its case-in-chief. However, even if the recording was presented by the government during trial, statements made by Green were admissible as statements made by a party opponent under Federal Rule of Evidence 801(d)(2), and statements made by Deeley on the recording were admissible as non-hearsay statements admitted to provide context. *See United States v. Dowe*, 313 Fed. App'x 531, 535 (3d Cir. 2009) (deciding that on a recording capturing a conversation between co-defendants, the statements of one conspirator to the other were admissible for the non-hearsay purpose of putting the other conspirator's words in context). Had it been presented by the government to the jury, trial counsel would have had no basis to object to such a recording on hearsay grounds.

Davis also argues that his trial counsel should have objected to what he alleges were inflammatory statements made by the prosecutor during closing argument.  He provides very little support for this claim, citing only one example, specifically when the prosecutor stated, "it must be pretty easy to sit on your yacht and ridicule the people who you manipulate to line your pockets with money." Dkt. No. 304 at 14.   Petitioner does not describe his basis for why this statement is inflammatory or otherwise objectionable.  In fact, this statement is not inflammatory, facially or otherwise.  It is an entirely permissible comment on the evidence that was delivered in the context of describing the Petitioner's attack on the credibility of Barbara Deeley:

> You saw what she really got for her involvement with these two. She got to be ridiculed and smeared on the stand.  When she said she did these things because she didn't want to go back to being a waitress, counsel for Davis started asking her what is wrong with being a waitress?  Like she was putting down people who work hard for their money.  She told him, I was stupid.  I was grateful to John Green.  I had a position that I never dreamed I would get to in my life.  And you know what? She is right. She should never have gotten that position.  But she did, and who gave it to her? John Green.  **It must be pretty easy to sit on your yacht and ridicule the people who you manipulate to line your pockets with money.**  So when counsel says Deeley is the root of all evil, remember who worked with her, who promoted her.  Who were her conspirators in breaking the campaign rules to stuff money into the campaign for John Green and James Davis's benefit?

Trial Tr. 3/28/2018 at 98.

In this case, one of Petitioner's apparent trial strategies was to vigorously attack the credibility of Barbara Deeley, who was an important witness for the government.  As stated above, Deeley was on the stand for two days and was often subjected to insulting or demeaning questions, for example, questions about whether she had a reputation for being a racist.  Additionally, defense counsel cross-examined other witnesses about Deeley.  And there is no mystery as to why they focused on her: Green and Davis conspired closely with and used Deeley to perpetrate their scheme

28

and to cover it up.  Because she had a unique insight into the conspiracy and provided damaging evidence against them, Green and Davis sought to destroy her credibility as a witness.  Evidence at trial showed that Deeley felt indebted to Green for promoting her within the PSO.  Once their conspiracy started, Davis and Green situated her in the middle of the conspiracy and indeed manipulated her dependence on Green to facilitate their scheme.  Therefore, she was present and involved in many of the transactions at the heart of the government's case.  Because Deeley was an essential witness for the government, and because the defendant placed her in their so-called crosshairs at trial, the government was entitled to comment in closing argument on the defendant's manipulation of her both during the conspiracy and at trial. Furthermore, the prosecutor's reference to a yacht was not superfluous or unnecessarily provocative, since Davis was charged with tax violations for illegally writing off personal expenses, such as the sale and upkeep of a luxury boat, as business expenses.

> iv.  <u>Trial Counsel was not ineffective for failing to request a separate evidentiary hearing to determine loss amount at sentencing.</u>

Davis next claims, as the government understands it, that his counsel was ineffective for not requesting an evidentiary hearing at sentencing to "more thoroughly" examine the factors for  loss amount and to consider his counsel's recommended adjustments to the Sentencing Guidelines, and for allegedly not challenging a purported claim by the government that no acquitted conduct would be used in the determination of loss amount, since he was acquitted of two counts of wire fraud.  For several reasons, the Petitioner's contention is meritless.

First, the Petitioner was not automatically entitled to an evidentiary hearing separate from his sentencing hearing to evaluate Sentencing Guidelines enhancements or other adjustments.  *See United States v. Kluger*, 722 F.3d 549, 562 (3d Cir. 2013).  Neither the "sentencing guidelines [nor] the Federal Rules of Criminal procedure [] require that a district court conduct an evidentiary

hearing in addition to a sentencing hearing at which the parties can be heard." Id.  The Guidelines require only the " 'district court to provide a procedure – but not necessarily an evidentiary hearing – in which the parties may argue contested sentencing issues.' "  *Id*. at 563, quoting *United States v. Cantero*, 995 F.2d 1407, 1413 (7th Cir. 1993); see also *United States v. Rennert*, 374 F.3d 206, 214 (3d Cir.2004), *vacated in part on other grounds, Miller v. United States,* 544 U.S. 958, (2005) (declining to impose an immutable requirement that the district court hold extensive hearings to make explicit, particularized findings in conspiracy case).  Not only was an extensive evidentiary hearing not required, it was not necessary in a case that proceeded to trial and where the evidence of the financial analysis was comprehensive.  Furthermore, the issues were briefed extensively by both parties and argued thoroughly at the hours-long sentencing hearing conducted by this Court.  Because the issues the Petitioner now raises were thoroughly considered at sentencing (and on appeal), the fact that his counsel did not request a separate evidentiary hearing presents no issues under *Strickland*.

In any event, Davis does not provide any details about how his sentence was calculated and why it was deficient, besides vague references to his counsel's recommended adjustments and acquitted conduct.

### v.  Trial Counsel was not ineffective in its advocacy on the jury charge.

In his Petition, Davis states that "although lead counsel objected to the closing of the jury charge because it did not included [sic] the qualifier "willingly" to return a verdict of guilty of braking [sic] the law, the court noted that lead counsel was not present to represent defendant's [sic] position on jury instructions before ruling against his objection and suggested corrective action." Dkt. No. 304 at 14.  Based on this, the Government understands that although Davis concedes that his attorney made the objection, he suggests that the absence of that same

attorney at a previous charging conference constitutes a basis for relief as ineffective assistance of counsel.  But Petitioner fails to note that he had two defense attorneys representing him at trial, that his other attorney was indeed present during the charging conference, and that his other defense counsel had thoroughly represented his position on jury instructions at both the pre-trial and trial stages.

On February 13, 2018, prior to the start of trial, the Petitioner's attorneys filed a 151-page document containing their proposed jury instructions as well as their joint objections to the government's instructions.  Dkt. No. 101.  The filing contained approximately 15 pages of legal argument in methodical detail, making objections on an instruction-by-instruction basis, complete with comprehensive case citations.  *Id*.  During trial and prior to the final jury charge, Davis's attorney met with the Government to negotiate the final instructions and submitted a joint brief to this Court on final proposed instructions.  Dkt. No. 153. Defense counsel also argued vigorously for his position before this Court at the charging conference.  There is no question that Davis was sufficiently represented on jury instructions in this matter.

Because one of Davis's defense counsel was present at the charging conference in question, filed lengthy and comprehensive briefs and proposed jury instructions prior to the conference, and otherwise thoroughly represented the Petitioner's interests in the jury instruction context – even admirably as noted by this Court – he has no basis to now claim that his counsel's conduct was defective.

vi.   <u>Appellate Counsel were not Ineffective in their Appellate Decisions.</u>

Davis claims that his appellate counsel were ineffective for proceeding on appeal solely on the issues of sufficiency of the evidence and on the Sentencing Guidelines calculation. While he concedes that it was a "reasonable legal decision" to proceed on these issues, he alleges

that appellate counsel's briefs before the Third Circuit "clearly show counsel neglected to thoroughly review trial transcripts for other appealable issues." Davis also concedes that appellate counsel discussed these other unspecified issues with him, but that they ultimately decided against raising the other issues on appeal. Because appellate counsel are entitled to use their professional judgment to determine appellate strategy, the Petitioner's claim fails.

While a criminal defendant is entitled to make certain fundamental decisions during the course of their case, such as the right to testify and whether to pursue an appeal, it is well established that other "non-fundamental decisions" fall within the responsibility of counsel. See *Sistruck v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996). For example, counsel is entitled to determine which issues to pursue on appeal and, in any event, need not raise every possible claim. *Id*.; *see also Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact, after exercising professional judgment, pursuing issues with a weak position "runs the risk of burying good arguments." *Id*. At 753. Furthermore, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751).

Here, there is every reason to believe that Davis's appellate counsel made a sound, informed judgment on which issues to appeal. According to Davis's petition, he discussed the issues with appellate counsel and made suggestions as to the issues that should be raised on appeal. This, according to Davis, included the issues raised by trial counsel in the Rule 29 and 33 post-trial motions, which incorporated trial counsel's arguments on the handwriting expert issue. Dkt. No. 172. Nonetheless, appellate counsel made the decision, which was within the bounds of his professional responsibility, to proceed on what he believed were the strongest arguments: attacking the Sentencing Guidelines calculation and challenging whether the Government had proved

beyond a reasonable doubt that the evidence presented at trial was sufficient to establish that Davis had offered Green campaign contribution bribes in exchange for an explicit promise or undertaking by Green to perform official acts, as required by *McCormick v. United States*, 500 U.S. 257 (1991). In presenting only the strongest arguments, counsel separated the wheat from the chaff and skillfully avoided the risk of diluting their position or losing credibility with the appellate court.

Furthermore, petitioner does not explain why any other appellate arguments were more likely to have been successful than those raised by appellate counsel. He merely concludes that a cursory review of the appellate brief would show obvious neglect by counsel. The Petitioner has not demonstrated any articulable facts as to his appellate counsel's performance that would form the basis for relief.

## III.   Claims of Prosecutorial Misconduct

In his petition, Davis also claims that prosecutors engaged in misconduct for allegedly allowing false testimony of two key factual witnesses, and for improperly vouching for a witness by reviewing the terms of her immunity agreement with the Government. Because there is simply no basis for the Petitioner's allegations of suborning perjury or improper witness vouching, his claim should be denied.

### A.   Legal Standard

The test for prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," in light of the entire proceeding by assessing the severity of the conduct, the effect of the curative instructions, and the strength of evidence against the defendant. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001). For due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the

defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly*, 416 U.S. at 643).   Additionally, a district court may dispose of "vague and conclusory allegations contained in a § 2255 petition" and claims that belie the record without further investigation. *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000).   Because the Petitioner's claims regarding perjury and witness vouching are entirely conclusory and without support or proof, this Court should dispose of these claims without requiring further evidence.

### B. <u>Argument</u>

#### 1. <u>The Government did not suborn perjury in this case.</u>

To establish prosecutorial misconduct for permitting false testimony, a habeas petition must establish that: (1) the government's witness committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict. *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). To be clear, "contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *United States v. Stadtmauer*, 620 F.3d 238, 269 (3d Cir. 2010) (citing *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991)). Moreover, one Eastern District of Pennsylvania court has found that the government objecting to defense witnesses does not amount to prosecutorial misconduct because the court only excluded witnesses where the defendant could not establish the relevance or admissibility of the testimony. See *United States v. Rashid*, No. CR 08-493-CMR, 2017 WL 2875378, at *5 (E.D. Pa. June 20, 2017).

In his Petition, Davis attempts to point out contradictions between and within the testimonies of Deeley and Augustus in support of his contention that the Government suborned

perjury.  He even notes that Deeley's testimony conflicted with his own testimony.  But these alleged contradictions are not perjury, and do not give rise to an inference that the prosecution supported perjured testimony.  Davis also alleges, without support or justification, that the government "[refused] to take time to review the qualifications of the handwriting expert and the credibility of the report," and "obstructed and refused to verify the authenticity of John Green signature on the very $50,000 mortgage loan document they presented to the jury." Dkt. No. 304 at 19, 20.  Furthermore, Davis claims that, because the government did not otherwise agree with the admission of this evidence, that it "in effect was violating their explicit pledge to the jury to investigate, expose, and initiate prosecution for any false statements made by their immunize [sic] primary witness."  Dkt. No. 304 at 20.

   As stated above, the evidence showed that John Green signed the documents, and despite attempts to feign confusion, he knew he had an obligation to re-pay the loan.  The evidence also showed that despite the defendants' best efforts on cross-examination, Deeley did not sign and did not know of the loan until much later in time.  Ultimately, the Petitioner and the government simply view the evidence differently, and to suggest that the government engaged in misconduct by opposing the admission of irrelevant and objectionable evidence is misguided and unsupported by the case law.

   2.   <u>The Government did not vouch for witnesses</u>.

   To establish improper vouching, the Petitioner must show that the prosecutor assured the jury that the testimony of a government witness was credible, and that this assurance was based on either the prosecutor's personal knowledge or other information not contained in the record. *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998). The ramifications of improper witness vouching by a prosecutor, to include its potential impact on the jury, are described *infra* at pp. 26-27.  However, what the Petitioner alleges as improper – the government's review of an

immunity agreement with an immunized witness during her testimony – does not constitute witness vouching and has been approved by many courts.  Indeed, the Third Circuit has allowed prosecutors to elicit the details of a plea agreement from a cooperating witness on direct examination. *United States v. Oxman*, 740 F.2d 1298, 1303 (3d Cir. 1984), *vacated on other grounds, sub nom. United States v. Pflaumer*, 473 U.S. 922 (1985); *United States v. Saada*, 212 F.3d 210, 225 n.16 (3d Cir. 2000); *United States v. Anapol*, No. CR. 93-262-01, 1994 WL 139408, at *3 n.6 (E.D. Pa. Apr. 19, 1994).  Admission of a witness's plea agreement has obvious probative purposes, to include: "(1) allow[ing] the jury accurately to assess the credibility of the witness; (2) eliminat[ing] any concern that the jury may harbor concerning whether the government has selectively prosecuted the defendant; and (3) explain[ing] how the witness has first-hand knowledge concerning the events about which he/she is testifying."  *United States v. Universal Rehabilitation Services, Inc.* 205 F.3d 657, 665 (3d Cir. 2000).  Furthermore, immunity agreements allow the jury to further assess a witness's credibility and may be introduced during direct examination.  *See United States v. Montani*, 204 F.3d 761, 763 (7th Cir. 2000) ("[W]e have held repeatedly that introducing evidence of a witness's guilty plea or immunity deal serves the 'truth-seeking' function of the trial by presenting all relevant aspects of a witness's testimony at one time.").  *See also United States v. Stadnisky*, 309 Fed. Appx. 185, 189 (9th Cir. 2009) (unpublished) (government may introduce evidence of a witness's immunity agreement during direct examination); *United States v. Craig*, 573 F.2d 513, 519 (7th Cir. 1978) (holding that it was not improper to elicit on direct examination of prosecution witness her understanding of the terms of immunity agreement); *United States v. Smolar*, 557 F.2d 13, 21-22 (1st Cir. 1977) (recognizing that witnesses' immunity agreements were proper subject of direct examination).  Prosecutors' questions on direct examination about a plea agreement's conditions are neither an assurance of

the cooperator's credibility or a reference to extra-record facts. *United States v. Magee*, 19 F.3d 417, 421 (8th Cir. 1994) ("None of the references to the plea agreements or the questions regarding them 'impl[ied] a guaranty of [either witness's] truthfulness, refer[red] to extra-record facts, or reflect[ed] a personal opinion.' Nor did the government suggest that the trial court, 'in accepting the plea agreements of the witnesses, had been satisfied as to the truthfulness of their proposed testimony.'" (citations omitted)).

Here, the Petitioner asserts that when the government asked a cooperating witness, Deeley, to read from her immunity agreement at trial, it "made it clear that the prosecution was vouching to hold Deeley to the terms of the immunity agreement with the threat of jail time if she testified falsely to any question during the trial" and "was telling the jury that they were vouching for the truthfulness of Deeley's testimony." Dkt. No. 304 at 18.  Under Third Circuit precedent, the actions of prosecutors in this case were not improper vouching.  In *Oxman*, the Third Circuit allowed the prosecutor, when on direct examination of cooperators, to "call[] to the jury's attention that the plea agreements . . . obliged them to testify truthfully," as the "government could reasonably anticipate that the beneficial features of the agreements would be used for impeachment purposes on cross-examination." *Oxman*, 740 F.2d at 1302. Similarly, here, since Deeley was a significant witness, the government reasonably anticipated that Deeley would be cross examined on the immunity agreement and properly preempted such impeachment on direct examination. Because the government's line of questioning about Deeley's immunity agreement is legally permissible and does not constitute witness vouching as a factual matter, the Petitioner's claim of prosecutorial misconduct on this basis must fail.

IV.   <u>**Certificate of Appealability and Evidentiary Hearing**</u>

Upon the denial of a Section 2255 motion by the District Court, an appeal to the Court of Appeals by the petitioner is not permitted unless he obtains a certificate of appealability. See 28 U.S.C. § 2253. The law permits the issuance of a certificate of appealability only if the applicant has made a substantial showing of the denial of a constitutional right.  See 28 U.S.C. § 2253(c)(2).

The application for such a certificate should first be made to the District Court. Local Rule 22.2 provides that "at the time a final order denying a petition under 28 U.S.C. § 2255 is issued, the district judge shall make a determination as to whether a certificate of appealability should issue.  If the district judge issues a certificate, the judge shall state the specific issue or issues that satisfy the criteria of 28 U.S.C. § 2253.  If an order denying a petition under § 2254 or § 2255 is accompanied by an opinion or a magistrate judge's report, it is sufficient if the order denying the certificate references the opinion or report."

The Third Circuit has further instructed that "as a matter of practice . . . an unsuccessful movant in a § 2255 case should in the first instance seek a certificate of appealability from the district court."  *United States v. Williams*, 158 F.3d 736, 742 n.4 (3d Cir. 1998). Accordingly, in the interests of judicial economy, the government requests that in addition to recommending the denial of the instant petition this Court also find that the Petitioner has failed to make a substantial showing of a denial of any constitutional right.  In order to present a substantial showing of a denial of any constitutional right, and in order to justify an appeal, the mere allegation of a constitutional wrong, such as deprivation of the right to effective counsel, is insufficient; the Petitioner must make a substantial showing of such an error in order to present an appeal.  *Santana v. United States*, 98 F.3d 752, 757 (3d Cir. 1996).  To establish the required

showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Further, the claim must be constitutional in nature; there may be no certificate of appealability for an issue which presents only a statutory or sentencing guidelines question.  *See United States v. Cepero*, 224 F.3d 256, 262-68 (3d Cir. 2000) (en banc), *cert. denied*, 121 S. Ct. 861 (2001).  For the reasons stated, Davis has not made the required showing, and therefore a certificate of appealability should be denied.

Furthermore, because the Petitioner's assertions regarding ineffective assistance of counsel and prosecutorial misconduct are either insufficient or contradicted by the record, no evidentiary hearing is necessary to resolve his Petition.  The record conclusively demonstrates that no relief is appropriate under 28 U.S.C. §2255(b).  Accordingly, no evidentiary hearing is required.

V.      **CONCLUSION**

        For all the above reasons, the government respectfully requests that the

Petitioner's motion to vacate, set aside or correct a sentence by a person in federal custody

should be denied without holding an evidentiary hearing and no certificate of appealability be

issued.


        Respectfully submitted,

        JACQUELINE C. ROMERO
        UNITED STATES ATTORNEY

        */s/ K.T. Newton for*
        Frank Costello
        Assistant United States Attorney
        Chief, Corruption & Civil Rights


        By: */s/ Sarah L. Grieb*
        Sarah L. Grieb
        Christopher Diviny
        Assistant United States Attorneys


        COREY R. AMUNDSON
        CHIEF, PUBLIC INTEGRITY SECTION
        U.S. DEPARTMENT OF JUSTICE

        By: */s/ Jennifer A. Clarke*
        Jennifer A. Clarke
        Deputy Chief
        Public Integrity Section

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed and also was mailed to the defendant at the address below on April 24, 2023.

James Davis, pro se
Prisoner No. 74050-066
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640


*/s/Sarah L. Grieb*
Sarah L. Grieb
Assistant United States Attorney